# United States Court of Appeals

*for the*

# Federal Circuit

CHALUMEAU POWER SYSTEMS LLC,

*Plaintiff-Appellant,*

– v. –

ALCATEL-LUCENT ENTERPRISE USA,

*Defendant-Appellee.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE, CASE NO. 1:11-CV-01175-RGA
THE HONORABLE RICHARD G. ANDREWS, JUDGE PRESIDING

---

## NON-CONFIDENTIAL BRIEF FOR DEFENDANT-APPELLEE

LANA S. SHIFERMAN
J. ANTHONY DOWNS
ROBERT FREDERICKSON, III
GOODWIN PROCTER LLP
53 State Street
Exchange Place
Boston, Massachusetts 02109
(617) 570-1000

*Attorneys for Defendant-Appellee*

April 10, 2015

Form 9

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Chalumeau Power Systems LLC      v. Alcatel-Lucent Enterprise USA, Inc.

No. 2015-1191

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellee Alcatel-Lucent Enterprise USA, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Alcatel-Lucent Enterprise USA, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

China Huaxin (through various subsidiaries) owns 85 percent of Alcatel-Lucent Enterprise USA and Alcatel-Lucent S.A. (through various subsidiaries) owns the remaining 15 percent.

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Representation in district court: J. Anthony Downs, Lana S. Shiferman, Robert Frederickson, of Goodwin Procter LLP; Jack Blumenfeld, Paul Saindon, of Morris, Nichols, Arsht & Tunnell LLP. Expected to appear in Federal Circuit:  J. Anthony Downs, Lana S. Shiferman, Robert Frederickson, of Goodwin Procter LLP.

12/29/2014
_____
Date

/s/ Lana S. Shiferman
_____
Signature of counsel

Lana S. Shiferman
_____
Printed name of counsel

Please Note: All questions must be answered
cc: all counsel of record

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..............................................................i

TABLE OF AUTHORITIES ...............................................................vi

STATEMENT OF RELATED CASES ...................................................1

STATEMENT OF JURISDICTION .....................................................1

INTRODUCTION ..................................................................................1

STATEMENT OF ISSUE ......................................................................3

STATEMENT OF THE CASE ...............................................................4

I.  CHALUMEAU'S INFRINGEMENT CLAIM AGAINST
    ALCATEL-LUCENT WAS NOT SUPPORTED BY THE
    SPECIFICATION OF THE '885 PATENT................................6

    A.  Background on the '885 Patent...........................................6

    B.  Chalumeau Never Set Forth a Coherent Infringement
        Theory of "Adapter of a First Type"..................................9

    C.  Chalumeau Did Not Dispute That Its Infringement
        Positions Were Frivolous In Opposition to Alcatel-
        Lucent's Motion for Attorneys' Fees................................12

II. CHALUMEAU'S PROPOSED CLAIM-
    CONSTRUCTIONS WERE UNTENABLE IN LIGHT OF
    THE '885 PATENT SPECIFICATION .....................................13

    A.  Chalumeau Changed Its Position Of The Term
        "Adapter Of The First Type" During Claim-
        construction........................................................................13

        1.  Chalumeau's Claim-construction Arguments to
            the District Court ..................................................13

        2.  The District Court Rejected Chalumeau's
            Arguments...............................................................16

    B.  Chalumeau's Argument that the "User Interface
        Connectors" Were Part of the "Network Hub" Was
        "Similarly Flawed"............................................................16

III. CHALUMEAU COMMITTED LITIGATION
     MISCONDUCT DURING THE COURSE OF THIS CASE .................19

**A.** **Chalumeau Names Alcatel-Lucent's French Parent as a Defendant Knowing That the French Entity Had No U.S. Operations** ..................................................................19

**B.** **Chalumeau Did As Little As It Possibly Could During Discovery** ........................................................................21

**C.** **Chalumeau Frivolously Opposed Alcatel-Lucent's Timely License Defense** ..........................................................23

**D.** **Chalumeau Overstates the Thoroughness of its Pre-filing Investigation to the District Court** ..........................25

**SUMMARY OF ARGUMENT** ...............................................25

**ARGUMENT** ...........................................................................29

**I.** **STANDARD OF REVIEW** .............................................29

**A.** **All Aspects of the District Court's Exceptional Case Finding Are Reviewed for an Abuse of Discretion** .........................29

**B.** **There is Not a Separate Standard of Review for "Claim Construction Frivolousness"** .............................................30

**II.** **CHALUMEAU CONCEDED BEFORE THE DISTRICT COURT THAT ALCATEL-LUCENT WAS THE PREVAILING PARTY AND THUS WAIVED ITS RIGHT TO CHALLENGE ALCATEL-LUCENT'S STATUS AS THE PREVAILING PARTY HERE** ....................................32

**III.** **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THIS CASE TO BE EXCEPTIONAL** ...............................................................33

**A.** **Chalumeau's Claim-Construction Positions for Key Terms Were Exceptionally Meritless** ...............................33

**1.** **Chalumeau's Construction of "Network Hub" Was Effectively No Construction At All, and It Was Contradicted by the Claim Language and the Specification.** .................................................................34

**a.** ***Chalumeau rewrote the plain language of the claims.*** .......................................................34

**b.** ***Chalumeau's construction of network hub was frivolous for the second reason that it was really no construction at all.*** .................................40

      2.     Chalumeau's Construction of "Adapter of a
              First Type" Was Equally Meritless. ........................................42

   B.   The District Court Did Not Abuse Its Discretion in
       Concluding that Chalumeau Did Not Conduct an
       Appropriate Pre-suit Investigation .................................................50

      1.     Chalumeau's Infringement Contentions
              Reflected a Frivolous Infringement Theory. ........................50

      2.     Chalumeau Misrepresented the Thoroughness
              of its Pre-suit Investigation to the Court. .............................53

IV.   CHALUMEAU SHOULD NOT BE "PRAISED" FOR
      DISMISSING ITS CASE AFTER TWO YEARS WHEN IT
      HAD NO OTHER CHOICE AND THE DISMISSAL HAD
      AN UNREASONABLE PRECONDITION .............................................55

   A.   A Voluntary Dismissal Does Not Foreclose an Award
       of Attorneys' Fees Under 35 U.S.C. §285 .......................................55

   B.   The District Court Did Not Abuse Its Discretion in
       Finding that Chalumeau's Entire Litigation Strategy
       Was Devoted to Stringing Out the Case in the Hopes
       that Alcatel-Lucent Would Incur Fees While
       Chalumeau Would Not .....................................................................55

   C.   Alcatel-Lucent's License Defense Was Not the
       Driving Force Behind Chalumeau's Decision to Drop
       the Case ..............................................................................................57

   D.   Chalumeau's Last-Minute Settlement Demand and
       Unreasonable Precondition Are Further Evidence of
       Its Bad Faith .......................................................................................59

V.    CHALUMEAU IS INCORRECT THAT THE DISTRICT
      COURT NEEDED TO REACH THE MERITS OF ITS
      INFRINGEMENT THEORY AS A PREREQUISITE TO
      DETERMINING THAT THIS CASE WAS
      EXCEPTIONAL ........................................................................................60

CONCLUSION ........................................................................................................62

CERTIFICATE OF SERVICE .............................................................................63

CERTIFICATE OF COMPLIANCE ....................................................................64

## CONFIDENTIAL MATERIAL

Materials that were made confidential pursuant to the protective order have been shaded in the confidential version of the brief and redacted from the non-confidential version of the brief.  These materials include confidential business information from documents and exhibits filed in the District Court.

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Brooks Furniture Mfg., Inc. v. Dutailer Int'l, Inc.*,
   393 F.3d 1378 (Fed. Cir. 2005)................................................... 26, 53

*Computer Docketing Station Corp. v. Dell, Inc.*,
   519 F.3d 1366 (Fed. Cir. 2008)................................................... 39-40

*Cooter & Gell v. Hartmarx Corp.*,
   496 U.S. 384 (1990) ........................................................30-32, 60-61

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
   527 F.3d 1318 (Fed. Cir. 2008)..................................................... 32

*Highmark, Inc. v. Allcare Health Mgmt. Sys, Inc.*,
   134 S.Ct. 1744 (2014) ...........................................................26, 30-31

*In re Papst Licensing Digital Camera Patent Litig.*,
   778 F.3d 1255 (Fed. Cir. 2015)..................................................... 40

*Joy Techs., Inc. v. Flakt, Inc.*,
   6 F.3d 770 (Fed. Cir. 1993)........................................................... 30

*Kilopass Tech., Inc. v. Sidense Corp.*,
   738 F.3d 1302 (Fed. Cir. 2013)..................................................... 53

*Octane Fitness, LLC v. ICON Health & Fitness*,
   134 S.Ct. 1749 (2014) ......................................................... *passim*

*Oplus Techs. Ltd. v. Vizio, Inc.*,
   No. 14-1297, slip op. (Fed. Cir. April 10, 2015) ............................... 5

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
   678 F.3d 1280 (Fed. Cir. 2012)..................................................... 32

*Parallel Iron, LLC v. NetApp, Inc.*,
   --- F.Supp.3d ---, 2014 U.S. Dist. LEXIS 127850 (D. Del. 2014) .............. 32-33

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................... 45, 47

*Pierce v. Underwood*,
   487 U.S. 552 (1988) ........................................................31, 60-61

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
   378 F.3d 1396 (Fed. Cir. 2004)..................................................... 33

*Raylon, LLC v. Complus Data Innovations, Inc.*,
   700 F.3d 1361 (Fed. Cir. 2012)................................................... 37-39

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
   717 F.3d 929 (Fed. Cir. 2013)....................................................... 39

*Sage Prods., Inc. v. Devon Indus., Inc.*,
   126 F.3d 1420 (Fed. Cir. 1997)..................................................... 50

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001)............................................................................ 47
*Taurus IP, LLC v. DaimlerChrysler Corp.*,
   726 F.3d 1306 (Fed. Cir. 2013)............................................................................ 42

**Statutes and Rules**
Fed. R. Civ. P. 11 ......................................................................................... 32, 54
35 U.S.C. § 285 .............................................................................................. *passim*

## STATEMENT OF RELATED CASES

None.

## STATEMENT OF JURISDICTION

None.

## INTRODUCTION

The district court properly exercised its discretion by finding this suit to be an exceptional case and awarding attorneys' fees under 35 U.S.C. §285.

Chalumeau Power Systems, LLC ("Chalumeau") filed this case against Alcatel-Lucent[1] expecting that Alcatel-Lucent, like others before it, would make the economic decision to pay Chalumeau a license fee that was less than the cost of defense. Alcatel-Lucent chose instead to fight against Chalumeau's baseless claims. To keep the "economics of the case" in its favor, Chalumeau did as little as possible. Its infringement contentions were perfunctory and did not cite any of the confidential Alcatel-Lucent technical documents that described how Alcatel-Lucent's products really work. Chalumeau also did not seriously engage in discovery. Interrogatories directed to Chalumeau's contentions on fundamental issues, such as infringement, damages, and invalidity, were never properly answered nor supplemented despite a court order. Chalumeau's Rule 30(b)(6)

---

[1] The business of Defendants Alcatel-Lucent USA, Inc. and Alcatel-Lucent Holdings, Inc. that includes the accused products was transferred to Alcatel-Lucent Enterprise USA Inc., which is now the appellee of record. A3040-3041.

1

witnesses were unprepared on critical issues, such as the circumstances surrounding Chalumeau's acquisition of the asserted patent. Chalumeau's claim-construction positions sought to eliminate or rewrite fundamental limitations in the asserted claim, not to construe those limitations in light of the plain language and intrinsic evidence. And when presented with facts proving that Alcatel-Lucent was licensed to the patent through its component suppliers, Chalumeau opposed Alcatel-Lucent's timely motion to amend the answer to add a license defense as futile, only to later concede that the license presented a problem and that it changed the "economics of the case."

Based on first-hand experience with Chalumeau's litigation conduct and arguments, the district court in a reasoned opinion ruled this case to be "exceptional" based on Chalumeau's conduct, including its unreasonable positions and its "meager effort" to litigate a case that was plainly without merit.

Now, clearly regretting its failure to act appropriately in the district court, Chalumeau comes to this Court seeking a second bite at the apple. Its brief is littered with new arguments that were never raised either in the district court before dismissal or in response to Alcatel-Lucent's motion for attorneys' fees. But having failed to make these arguments in the appropriate forum, Chalumeau's newfound zeal to litigate the merits comes too late.

The sole issue for this Court is whether the district court, considering the

2

totality of circumstances—not individual issues in isolation as Chalumeau argues—abused its discretion by finding this case to be exceptional.  This Court should examine the *actual* arguments that Chalumeau made, not new arguments that it could have made but did not.  Chalumeau cannot show that the district court abused its discretion based on arguments Chalumeau never presented to the district court.  In fact, Chalumeau's need to raise new arguments on appeal is just further evidence of the type of effort that it put forth.

In the end, Chalumeau itself essentially admitted its case was meritless when it moved to dismiss its own claims with prejudice – but it did so only after one final settlement demand and on the precondition that Alcatel-Lucent forfeit its right to seek attorneys' fees.  Now Chalumeau seeks to be "praised" for its dismissal after forcing Alcatel-Lucent and the court through more than two years of litigation.  As set forth below, the district court was well-positioned to determine whether this case was "exceptional" under §285 and did not abuse its discretion in so finding here.  Accordingly, this Court should affirm.

## STATEMENT OF ISSUE

Whether the district court considering the totality of circumstances abused its discretion by finding Chalumeau's case against Alcatel-Lucent exceptional and awarding Alcatel-Lucent its attorneys' fees.

## STATEMENT OF THE CASE

Shortly after Chalumeau acquired the '885 patent, it began asserting that patent against manufacturers and suppliers of Ethernet switches. A2313. Chalumeau's first wave of cases were largely settled through a Patent License, License Option and Assignment Agreement between Chalumeau and RPX Corporation ("RPX") in September 2011. A2311.

Two months later, Chalumeau sued Alcatel-Lucent for infringement of claims 8 and 9 of the '885 patent. Spanning more than two years, the case involved multiple procedural motions, claim-construction and fact discovery. A0003-0019. Then one month before expert reports were due and with no damages expert even disclosed (A2109), Chalumeau made a final attempt to settle the case for $100,000. A2540. Alcatel-Lucent rejected that offer, and later that *same day*, Chalumeau stated that it would walk away from the case. *Id.* Chalumeau, however, preconditioned its dismissal on Alcatel-Lucent's agreement to waive its right to seek attorneys' fees. A2095. Alcatel-Lucent declined. Chalumeau then filed a motion to dismiss the case with prejudice on January 28, 2014 (A0019), seeking to obtain an order requiring "each party to bear its own costs and fees." A2020. Alcatel-Lucent opposed, and on January 31, 2014, the court dismissed the case with prejudice but "left open" "[i]ssues about costs, exceptionalness, etc." A0019.

On February 14, 2014, Alcatel-Lucent timely moved for attorneys' fees. A2090-2115. Shortly thereafter, the Supreme Court revised the standard for fees under §285 in *Octane Fitness, LLC v. ICON Health & Fitness*, 134 S.Ct. 1749 (2014), and the district court heard argument at the hearing under the new, lower *Octane* standard. *Oplus Techs. Ltd. v. Vizio, Inc.*, No. 14-1297, slip op. at 6(Fed. Cir. April 10, 2015) ("change in the law lowers considerably the standard for awarding fees").

In a written opinion, the court declared this case exceptional under 35 U.S.C. §285, and awarded fees to Alcatel-Lucent. A0024-0031; A3043-3044. The court's calculation of the fee award has not been appealed by either party. A3043. The court's decision was based on the totality of the circumstances discussed *infra*, including that:

- Chalumeau's infringement contentions, based entirely on public documents, identifying an RJ-45 connector as the claimed "adapter" were frivolous;

- Chalumeau's proposed constructions for "adapter of a first type" and "network hub" / "user interface connector" were "similarly flawed"; and

- Chalumeau's overall litigation misconduct exemplified by the "meager effort Chalumeau put forth," including its inadequate pre-suit

investigation, discovery conduct, late disclosure of a technical expert,
and its baseless opposition to Alcatel-Lucent's motion to amend to
add a license defense as futile.

## I.     CHALUMEAU'S INFRINGEMENT CLAIM AGAINST ALCATEL-LUCENT WAS NOT SUPPORTED BY THE SPECIFICATION OF THE '885 PATENT

The district court found that Chalumeau's infringement theory was frivolous
because it was clearly inconsistent with the plain teachings of the '885 patent.
A0025-0026.

### A.     Background on the '885 Patent

The '885 patent is entitled "Method and Apparatus for Detecting Presence of
a Remote Device and Providing Power Thereto."  Chalumeau alleged that Alcatel-
Lucent's Power-over-Ethernet switches infringed independent claim 8 and
dependent claim 9 of the '885 patent.  Claim 8 recites:

A network system comprising:

a plurality of ***user interface connectors*** each adapted for coupling to a
remote device; and

a ***network hub*** coupled to the plurality of user interface connectors for
communicating data between remote terminals coupled thereto, for
identifying the operational protocol of a coupled device that indicates the
type of device and communicating with said coupled remote device in said
identified operational protocol, and for identifying the presence of an
***adapter of a first type*** coupled to at least one of the plurality of user
interface connectors and continuously providing electrical power to the
adapter according to the type of device in response to the identified presence

of said adapter and stop providing the electrical power to the adapter in response to no identified presence of the adapter.

A0049 (emphasis added).

According to the Background of the Invention, at the time the '885 patent was filed, "[r]ecently, both portable computers and computer networks include infrared transceivers that allow wireless communication between the portable computer and the computer network for increased mobility." A0043(1:25-26). To support these infrared means of connecting to the network, the computer network included an "infrared transceiver" and a "protocol conversion bridge" that converted the infrared signal into a "protocol of the computer network." A0043(1:28-31). The '885 patent explained that both the "infrared transceiver" and the "protocol conversion bridge" required a dedicated electrical power supply, which "increase[d] system costs and require[d] an AC electrical power outlet." A0043(1:35-37). To overcome these perceived problems, the '885 patent disclosed a system of "network hubs" that can identify and classify devices running different local area network ("LAN") protocols (*e.g.*, infrared, Ethernet, Token Ring), and in the event that an infrared adapter is detected on the network, the "network hub" will supply power to that infrared adapter using the same cable that carries the data communication. Specifically, the '885 patent teaches:

> The network 201 provides electrical power to an IR adapter 206 when the IR adapter 206 is coupled to the network hub 202, ***but does not provide electrical power for other adapters for other protocols***. If the

7

network 201 determines that another type of device ***other than an IR
adapter 206*** is coupled to a user interference connector 204, ***the
network 201 does not apply electrical power***.

A0045(5:56-63) (emphasis added).  The network hub "does not provide electrical
power to the connector and the twisted-pair cable when either adapters of another
type (such as Ethernet, 10Base-T, 100Base-TX 100Base-T4, and Token Ring
adapters) are connected or when no adapter is connected."  A0044(4:50-58).[2]

The specification defines three different "types" of adapters—an "adapter of
a first type," "an adapter of a second type," and "an adapter of a third type."
A0044(4:17-26); A0047-0048(10:8-12:8) (describing operation of the adapter of a
first type); A0048(12:9-19) (describing operation of the adapter of a second type),
and A0048(12:20-43) (describing operation of the adapter of a third type).  The
"adapter of a first type" is identified as an infrared adapter 206 and it is the only
adapter identified by the specification as capable of receiving power from the
network hub.  A0047-0048.  In contrast, the "adapter of a second type" lacks the
circuitry to provide the signal to the network hub to identify it as an infrared
adapter.  A0048(12:16-19) ("Because no signal is received, the comparator 624
does not generate a presence signal 638 to indicate that an infrared adapter 206 is
coupled to the device presence [de]tector 414.").  The circuitry of the "adapter of a

---

[2] 10Base-T, 100Base-TX 100Base-T4 are references to the Ethernet IEEE standard
that specify data transmission parameters.  A1436-1437.

third type" differs from both the adapter of a first type and an adapter of a second type, but it too does not receive power from the network hub.  A0048(12:20-43).

### B.    Chalumeau Never Set Forth a Coherent Infringement Theory of "Adapter of a First Type"

The '885 patent acknowledges that much of the "network system" recited in claim 8 was known in the prior art.  A0043(2:11-26).  When the '885 patent was filed in June 1997, "user interface connectors" were well known in the art.  The patent identifies "conventional RJ45 connectors" as one potential type of "user interface connector."  A0045(5:26-29).  "RJ-45" refers to industry standard plugs and sockets that are used to connect Ethernet cabling to Ethernet devices, and are described in the IEEE standard for Ethernet (802.3) (A1560), which the '885 patent incorporates by reference A0043(1:54-58):



Fig 12-30
DTE and Hub Connector

Fig 12-31
Cable Connector

The '885 patent also does not purport to invent "network hubs."  The specification acknowledges that "conventional network hubs" were known.  A0046(7:16-18) ("Reusing existing conventional hubs and sharing the same

connector reduces the system cost and increases the convenience of network access."). The '885 patent further acknowledges that these conventional network hubs already performed two of the functional limitations of claim 8— "communicating data between remote terminals" and "identifying the operational protocol of a coupled device." A0043(2:11-12); A0043(2:29-55). Accordingly, the claimed capability to "identify[] the presence of an adapter of a first type … and continuously provid[e] electrical power to the adapter … in response to the identified presence of said adapter" was central to the case.

In its contentions, Chalumeau took the untenable position that the "adapter of a first type" was a commonplace RJ-45 *plug* at the end of an Ethernet cable. A2639. Specifically, Chalumeau asserted that "[e]ach of the Accused [Alcatel-Lucent] Products include a plurality of user interface connectors, *i.e.,* RJ-45 ports, that are adapted for coupling to a remote device, such as a computer, VoIP telephone, PoE wireless access point, etc." A2639. It then asserted that "[t]he Ethernet hub/switch in each of the Accused 6200 Series Products identifies the presence of an *adapter (i.e., RJ-45 adapter)* when coupled to any of the user interface connectors (*i.e., RJ-45 ports*) and continuously provides power to the adapter in accordance with the type of remote device that is attached." A2642 (emphasis added). In other words, Chalumeau alleged that infringement occurred

10

when the Ethernet hub "identified the presence" of an Ethernet plug being inserted to the port on the switch.

There is no support anywhere in the specification that the '885 patent claimed detecting the presence of a **_plug_**. Notably, Chalumeau's infringement contentions use the term "RJ-45 adapter," which appears nowhere in the '885 patent. Instead, the claim and specification are clear. The '885 patent is directed towards detecting and classifying **_devices,_** and claim 8 is directed towards adapters. The specification discloses how an infrared or radio frequency adapters allow computers to communicate with the wireless network. A0045(5:44-50); A0045(5:65-67) ("Although the adapter 206 is described herein as operating with infrared, the adapter 206 may provide wireless coupling other than infrared, such as radio frequency."). "Adapters" are not plugs. Moreover, claim 8 does not claim any adapter, but an "adapter of a first type." The term "adapter of a first type" is defined in the specification to be "remote terminal 602-1, which is an infrared adapter 206…." A0047(10:8-10).

Chalumeau's initial infringement contentions were served on December 17, 2012. A2638. By May 10, 2013, when the parties submitted their Joint Claim-construction Chart, Chalumeau had changed its interpretation. Its claim-construction position was that an "adapter" was a "network interface device," not a plug or connector. A1230-A1239. Chalumeau never supplemented or amended its

infringement contentions, however, to disclose any new infringement theory.

A2515-2517.

### C.     Chalumeau Did Not Dispute That Its Infringement Positions Were Frivolous In Opposition to Alcatel-Lucent's Motion for Attorneys' Fees

In its fee motion, Alcatel-Lucent argued that "no reasonable person reading the specification of the '885 patent would conclude that the 'adapter of a first type' was a plug, and it [was] unconscionable (let alone 'grossly unjust') that a patentee can trigger million-dollar patent litigations on such an obviously wrong infringement theory." A2108. In opposition, Chalumeau did not address, let alone dispute, this argument. A2459-2460. Neither did Chalumeau's expert. Instead, Chalumeau's expert offered the carefully worded and entirely conclusory single sentence opinion that "at all times—both prior to the Court's claim construction, and following the Court's claim construction—Plaintiff had a reasonable, good faith infringement read on all of the accused products." A2485. Chalumeau, however, never explained that "good faith infringement read" to the court.

Chalumeau's only other argument was its criticism of Alcatel-Lucent for "never mov[ing] to strike Chalumeau's infringement contentions during the course of this litigation and never mov[ing] to compel Chalumeau to provide more detailed infringement contentions." A2459. This argument missed the point. It was not Alcatel-Lucent's obligation to identify deficiencies in Chalumeau's

12

infringement case, and it said nothing about the reasonableness of Chalumeau's positions.  Because Chalumeau never defended its infringement theory on the merits, the district court concluded "there was never any argument that an RJ45 connector was capable of receiving power."  A0026.

## II. CHALUMEAU'S PROPOSED CLAIM-CONSTRUCTIONS WERE UNTENABLE IN LIGHT OF THE '885 PATENT SPECIFICATION

The district court also found Chalumeau's claim-construction arguments for two critical terms, "adapter of a first type" and "user interface connector"/ "network hub,"[3] to be frivolous.  A0027-0029.

### A. Chalumeau Changed Its Position Of The Term "Adapter Of The First Type" During Claim-construction

#### 1. Chalumeau's Claim-construction Arguments to the District Court

For the term, "for identifying the presence of an adapter of a first type," Chalumeau's proposed construction was "having the capability of identifying the presence of an adapter of a particular type."  A1362.  To state the obvious, the only substantive difference between the claim language and Chalumeau's proposed construction was the change of "first type" to "particular type."

---

[3]"User interface connector" and "network hub" were presented as two terms, but the central dispute concerning the relationship between "user interface connectors" and "network hubs" cut across both.

During claim construction, Chalumeau's brief contained only one paragraph on the phrase "for identifying … adapter of a first type," with four sentences addressing the "particular type" portion of its construction. A1362-1363. Chalumeau's argument was that because the specification identified various types of adapters, the inclusion of the phrase "of a particular type" was "wholly consistent" with the specification. A1362. Chalumeau also cited case law that the term "first" "is a common patent-law convention to distinguish between repeated instances of an element or limitation," even though no "second" type was recited in the claim. A1363. Chalumeau offered no other arguments defending its proposed construction in its reply. Instead, its strategy (which it repeated in opposing Alcatel-Lucent's fees motion and again on appeal) was to criticize *Alcatel-Lucent's* proposed construction for importing limitations from the specification. A1367-1369.

By the claim-construction hearing, the two disputed constructions of "adapter" and "for identifying … adapter of a first type" had crystalized into a single issue for the district court: under Chalumeau's proposed construction what is the difference between an "adapter" generally and an "adapter of a first type." A2138-2139. Chalumeau still has not offered a reasonable response to that simple question. A2143. Initially, Chalumeau argued that "[i]nsofar as the claim is concerned, there is no difference" between "adapter" and "adapter of a first type."

14

A2139.  The district court responded "[t]hat can't be right.  Are you saying that the inventor just put in the words 'of a first type' for no good reason, [it] has no meaning?"  A2139-2140.  Chalumeau's second argument was that "it could have been a drafting error, your Honor."  A2140.  The district court correctly noted that argument had not been raised by Chalumeau in either of its briefs.  A2140.

Chalumeau also sought to obfuscate during the claim-construction hearing.  It did not provide a straight answer to the question—What kind of adapter is disclosed in Figure 6A?—which was the only embodiment using the term "adapter of a first type."  Instead, Chalumeau reverted to its overbroad construction, "[i]t is an adapter, network interface device that is capable of receiving electrical power and data."  A2142.  But the '885 patent is explicit that "FIG. 6A is a schematic diagram of a device presence detector … which is an infrared adapter."  A0047(10:8-10).  In addition, when asked whether the "adapter of a first type could include ethernet 10Base-T, 100Base-TX, 100Base-T4 and Token Ring," Chalumeau argued, "[t]hat's what the patent says, your Honor."  A2146.  In fact, the patent says the opposite.  The patent teaches, "[m]ore particular, the network hub … ***does not provide electrical power*** to the connector and the twisted-pair cable when either adapters of another type (such as Ethernet 10Base-T, 100Base-TX 100Base-T4, and Token Ring adapters) are connected or when no adapter is connected."  A0044(4:50-58) (emphasis added).

15

### 2. The District Court Rejected Chalumeau's Arguments.

The district court correctly rejected Chalumeau's construction that "adapter of a first type" meant "adapter of a particular type," noting that the specification refers to "adapters of a first type, second type, and third type." A1941. "Figure 6a shows an adapter of a first type, Figure 6b shows an adapter of a second type, and Figure 6c shows an adapter of a third type." A1941(citing 4:17-26). According to the specification, the adapters of the "second type" and "third type" do not receive power. A0048(12:9-43). "Clearly then, an 'adapter of a first type' cannot be just an 'adapter of a particular type,' as that would include adapters of a 'second' and 'third' type, which do not receive power" and are not recited as part of claim 8. A1941.

### B. Chalumeau's Argument that the "User Interface Connectors" Were Part of the "Network Hub" Was "Similarly Flawed"

Claim 8 also requires a "network hub *coupled to* the plurality of user interface connectors…." A0049 (emphasis added). Chalumeau's proposed construction of "network hub" was "a device *having a plurality of user interface connectors*, that is capable of (i) identifying the operational protocol of a couple device; (ii) communicating data and power to the coupled device when an adapter is identified as present; and (iii) stopping power when the adapter is no longer identified present." A1342-1343 (emphasis added).

In its claim-construction brief, Chalumeau argued that "[t]he '885 Patent teaches that a network hub has a plurality of user interface connectors." A1343. This was wrong. The portion of the specification Chalumeau cited actually states that the "[t]he network hub 202 includes a plurality of ***hub user*** connectors 208," not user interface connectors 204. Chalumeau's second argument was that "[n]othing in the Patent's specification or the claim language mandates that the network hub and the user interface connectors be *separate*, as required by Defendants' construction. To the contrary, the network hub and the user interface connectors are connected and associated by coupling and are, therefore, clearly not separate." A1333-1334. Chalumeau resorted to relying on obvious typographical mistakes in order to defend its positions. A1937.

The district court found several problems with Chalumeau's constructions of "user interface connectors" and "network hub." The Court found that "[i]n every instance, save for a few apparent typos, the specification describes the user interface connectors as being physically separate from the network hub." A1937 (citing Fig. 2). In fact, the term "connector" appears over 100 times in the '885 patent. With reference to Figure 3 (reproduced below), those connectors include: "hub user connectors 308, 320, and 324" (red), "up-link connector 310, 322, 326" (blue) "pass-through connector 309" (yellow), and "user interface connector 204" (green).

17



FIGURE 3

The district court's characterization that Chalumeau was relying on apparent typos was also correct. Throughout the specification, the "user interface connector" is assigned reference numeral 204. In one instance, the specification refers to "hub user connector 204." A0045(6:33-37). But in the same description of the same embodiment, the '885 patent corrects itself and confirms that the connector 204 is a "user interface connector." A0045(6:59). In **every other instance** that "connector 204" is referred to, it is described as a user interface connector. A0045-0048(*e.g.*, 5:5, 5:8, 5:10-11, 5:27, 5:33, 5:40, 5:61-62, 6:5-8, 9:40-41, 11:19, and 13:11). The second apparent typo Chalumeau relied on was a single instance where the patent refers to "hub user interface connector 308." A0046(8:33). Importantly, the claim term at issue was "user interface connector"

18

not "hub user interface connector." Without any context, the single reference to a "hub user interface connector" in the specification is ambiguous at best. Any ambiguity is definitively resolved, however, by simply reading the rest of the paragraph. In the *six* other instances that item 308 is referred to in that one paragraph, it is identified as a "hub user connector 308" every time.

Finally, the Court also rejected Chalumeau's nonsensical argument that "things that are 'coupled' are *not* 'separate.'" A1340. The court found that "[i]t is perfectly understandable that while the user interface connectors themselves are separate from the hub, they may be coupled to the hub via cable." A1937-1938.

## III. CHALUMEAU COMMITTED LITIGATION MISCONDUCT DURING THE COURSE OF THIS CASE

The district court also found that "Chalumeau's entire litigation strategy was devoted to stringing out the case in the hopes that Alcatel would incur fees while Chalumeau would not" (A0030) and characterized Chalumeau's effort to be "meager." A0027.

### A. Chalumeau Names Alcatel-Lucent's French Parent as a Defendant Knowing That the French Entity Had No U.S. Operations

When this case was filed, the accused switches were sold in the United States by Alcatel-Lucent USA, Inc. and Alcatel-Lucent Holdings, Inc., which were subsidiaries of Alcatel Lucent S.A. A0085. Alcatel-Lucent S.A. is a holding company that owns no property, maintains no offices, and conducts no business in

19

the United States.  A0087.  Nonetheless, Chalumeau named Alcatel Lucent S.A. as a defendant.  A0087.  Alcatel-Lucent promptly requested that Chalumeau dismiss its French parent.  A0088-0089.

Chalumeau refused, even though Chalumeau's parent entity, Acacia, had encountered the same issue only months earlier in another case.  A0085.  Another Acacia subsidiary, Lambda Optical Solutions, LLC ("Lambda") had named Alcatel Lucent S.A. as a defendant in a case also involving the US entities.  *Lambda Optical Solutions, LLC v. Alcatel Lucent SA et al.,* No. 10-cv-00487-RGA-CJB (D. Del.).  A0085.  In Lambda's opposition to Alcatel Lucent's S.A.'s motion to dismiss for lack of personal jurisdiction, Lambda wrote:  "All Lambda sought was to avoid its own position being worsened in the ***highly unlikely event*** that there turns out to be a basis for asserting the patent against Alcatel SA after all."  A2358 (emphasis added).  Lambda eventually stipulated to dismiss Alcatel Lucent S.A. in that case.  A0088.

In this case, however, the Acacia entity refused to stipulate to dismissal, which required needless motion practice.  Even knowing that it was "highly unlikely" that it would uncover facts to support its argument, Chalumeau sought and obtained jurisdictional discovery from Alcatel Lucent S.A. in this case.  A0549-0550.  The issue was only resolved when the Court granted Alcatel Lucent S.A.'s motion to dismiss.  A1036-1037.  Chalumeau's pursuit of unfounded claims

20

against the French parent forced Alcatel-Lucent to incur unnecessary expense, apparently out of a desire to gain additional leverage over Alcatel-Lucent.

### B.    Chalumeau Did As Little As It Possibly Could During Discovery

Outside of its efforts to create settlement leverage, Chalumeau's prosecution of its case on the merits was minimal.  Its preliminary infringement contentions were formulaic and cited to ***none*** of the documents that Alcatel-Lucent produced as part of its core technical document production.[4]  A1729-1742.  Chalumeau never supplemented those infringement contentions.  A2096; A2107-2109.

Chalumeau also never provided substantive responses to Alcatel-Lucent's interrogatories that sought to elicit Chalumeau's contentions concerning infringement, invalidity, and damages.  A2517-2518.  In fact, the Court had ordered Chalumeau to supplement certain interrogatories, including those directed towards damages.  A1209-1210.  It never did.  A2518.  When this failure was raised in Alcatel-Lucent's motions for fees, Chalumeau argued that "ALU never asked Chalumeau to supplement its discovery responses or moved the Court to compel Chalumeau to take such action."  A2464.  Chalumeau was wrong, and the district court noted Chalumeau's misrepresentation: "THE COURT:  I think the

---

[4] On October 31, 2012, Alcatel-Lucent made its production of core technical documents, are required by the Scheduling Order, which consisted of hardware and software specifications for Alcatel-Lucent's PoE switches, including identification of all component chips and their suppliers.  A2524.

point is, your brief made it sound as though they didn't try to follow-up on what they regarded as your deficiency. That doesn't actually seem to be the case." A2609-2610 (handing Order to Chalumeau's counsel).

Finally, Chalumeau made no effort to prepare its Rule 30(b)(6) witness on information plainly available to Chalumeau. Instead, it took the untenable position that the information Alcatel-Lucent sought was in the possession of the parent entity, Acacia, not Chalumeau. For example, Alcatel-Lucent sought Rule 30(b)(6) testimony from Chalumeau on core issues concerning Acacia's acquisition of the '885 patent, due diligence and valuation of the '885 patent, and enforcement of the '885 patent. Time after time, Chalumeau's Rule 30(b)(6) witness admitted to having taken no steps to prepare for his testimony on those topics. A2182; A2183-2185; A2189; A2208; A2225; A2238; A2244; A2246-2247. Chalumeau's attorney sought to obstruct the deposition repeatedly objecting to questions directed towards, *e.g.*, Acacia's acquisition of the '885 patent, were "outside the scope" of the deposition because, *e.g.*, "that's not a topic that he's being presented on here today. He's here on behalf of Chalumeau. This is an Acacia Clarinet agreement." A2182(73:14-16). At one point, Chalumeau's counsel threatened that "I warned you early on, you keep going down this Acacia path. He's here on behalf of Chalumeau. I'm seriously contemplating stopping this deposition and calling the Court." A2188(97:7-10). These objections and Chalumeau's failure to prepare its

22

CONFIDENTIAL MATERIAL REDACTED

own witness were particularly remarkable because Chalumeau's Rule 30(b)(6)

witness was *an Acacia employee*.  A2167.

Moreover, when Acacia Rule 30(b)(6) witness was deposed, he was even

*less* prepared.  A2110; A2415-2428.

### C.    Chalumeau Frivolously Opposed Alcatel-Lucent's Timely License Defense

When it became apparent through discovery that Alcatel-Lucent had a

license defense based on the RPX Agreement that sub-licensed Alcatel-Lucent's

suppliers, Chalumeau frivolously opposed Alcatel-Lucent's timely motion to

amend.  Now Chalumeau tries to justify its conduct by arguing that its own license

agreement is complicated, Br. 12–17, but it is not.  The sublicenses granted by

Chalumeau to RPX are far reaching.  Under the plain terms of the RPX License,

the sublicenses extend to any RPX Licensee's ███████████████████████

███████████ provided that the product at-issue qualifies as a ████████████

███████████ A2317 (§1.2(c)).  ████████████████████████ was defined

expansively to be any product (including components) ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ A2314.  The

license granted by Chalumeau to RPX (and its members) expressly extended to

combined products that included licensed components (a ██████████████

██████████████. A ████████████████████████████ was any

23

CONFIDENTIAL MATERIAL REDACTED

██████████████████████ of a ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

A2312 (emphasis added).  In other words, if a RPX Licensee's product is a

component (*e.g.*, circuitry or chip) of another larger product (*e.g.*, an Ethernet

switch), the sublicense extends to that larger product if ████████████████

████████████████████████████████████████████████████

Alcatel-Lucent only learned which companies were licensed under this

agreement when RPX produced to Alcatel-Lucent in response to a third party

document subpoena, a list of over 100 companies to which RPX had granted a

sublicense to the '885 patent.  A1930.  Included on that list were Alcatel-Lucent's

suppliers ████████████████████ (which had been disclosed to Chalumeau

nearly a year earlier on October 31, 2012 (A2524)).  A1930.  Alcatel-Lucent then

provided RPX's list of licensees to Chalumeau two days later, and within a week,

requested Chalumeau's consent to amend its answer to assert additional defenses

based on the licenses granted to Alcatel-Lucent's suppliers.[5]  A1779.  Without

explanation, Chalumeau refused to consent to the amendment.  A1780.

---

[5] Alcatel-Lucent sought leave to amend its answer within the time provided by the
Scheduling Order.  A1775.

Chalumeau then opposed leave to amend on the ground the license defense was futile, stating: "Alcatel's proposed affirmative license defense is futile, since, as a matter of law, no license was, or has been, granted by RPX to Alcatel." A1915. The district court's opinion noted that Chalumeau's futility argument "appears to be simply an argument made without any factual basis." A0029-0030.

### D.    Chalumeau Overstates the Thoroughness of its Pre-filing Investigation to the District Court

In its fees motion, Alcatel-Lucent argued that Chalumeau's infringement contentions suggested that Chalumeau did not perform an adequate pre-suit investigation. A2096. In response, Chalumeau asserted that "[a] thorough pre-filing investigation for each of the accused products occurred and each family of product was separately charted with relevant supporting technical documentation." A2459. At the hearing, Chalumeau's attorney could not answer the court's questions concerning the thoroughness of that investigation or even whether Chalumeau's statement was accurate. A2614. When Chalumeau submitted its pre-suit charts for *in camera* inspection, the truth came out. Chalumeau did not "separately" chart "each product family"; it had only investigated a ***single*** product and did not separately analyze each claim limitation. A2634.

### SUMMARY OF ARGUMENT

The district court properly exercised its discretion in finding this an exceptional case under §285 based on the totality of the circumstances including

Chalumeau's frivolous claim-construction positions, its baseless infringement theory, its inadequate pre-suit investigation, and its "meager" effort prosecuting its infringement case. The district court applied the correct legal standard and offered substantial justification for its finding. There was no abuse of discretion.

Chalumeau only pays lip service to the Supreme Court's decisions in *Octane* and *Highmark*. The substance of its brief, however, acts as if those decisions do not exist. It suggests that "claim construction frivolousness" is governed by a less deferential standard because it alleges that the district court committed certain legal errors. For this proposition, Chalumeau tellingly relies on a pre-*Octane* case that applied the "exacting" and now-abrogated standard under *Brooks Furniture Mfg., Inc. v. Dutailer Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005). *Brooks Furniture* is no longer the law, and the Supreme Court was unequivocal that this Court is to review "all aspects" of a district court's exceptional case finding under an abuse of discretion standard, including questions of law. *Highmark, Inc. v. Allcare Health Mgmt. Sys, Inc.*, 134 S.Ct. 1744, 1747 (2014).

Chalumeau reargues claim-construction of the fundamental terms, improperly presenting new arguments on appeal. Chalumeau sought to construe "adapter of a first type" as "adapter of a particular type." Chalumeau's construction was meaningless. All adapters are adapters of a "particular" type. Chalumeau's construction was particularly inexcusable in light of the intrinsic

record, which defined and distinguished between adapters of a "first type," "second type," and "third type."  Indeed, the district court found that Chalumeau's proposed construction to be "one of the wors[t] proposed constructions [he's] ever seen so far."  A0028.

For the term "network hub," Chalumeau does little to defend its own construction or the arguments made to the district court because Chalumeau's construction is indefensible.  The claimed "network hub" must be "coupled to a plurality of user interface connectors."  Chalumeau sought to change that plain language by advancing a construction where the "network hub" would "hav[e] a"—not be coupled to—"a plurality of user interface connectors."  The rest of Chalumeau's proposed construction repackaged functional limitations found elsewhere in the claim, effectively turning its construction of "network hub" into no construction at all.

The district court found that in addition to advancing frivolous claim-construction positions, the infringement theories in Chalumeau's infringement contentions were frivolous because Chalumeau equated an "adapter of a first type" with a commonplace plug found at the end of everyday Ethernet cable.  The district court reached the commonsense and obvious conclusion that when the patentee wanted to refer to plug or socket, it used the term "connector," and when it wanted to refer to an "adapter," it used the term "adapter."  The two terms were not the

same and are certainly not interchangeable.  Chalumeau offers a new argument on appeal that "nothing precluded an 'adapter' from *using* RJ-45 connectors."  Br. 39 (emphasis added).  This makes Alcatel-Lucent's point.  Chalumeau's infringement contentions were not that the adapter "used" an RJ-45 connector; its position was that the adapter *was* the RJ-45 connector.  Thus, instead of defending the argument it actually made to the district court, Chalumeau seeks to recast those arguments into something more defensible.

The district court also took issue with Chalumeau's pre-filing investigation, where the Ordered *in camera* inspection ordered by the court revealed that Chalumeau misrepresented the thoroughness of its pre-filing investigation to the district court.

Additionally, the district court found that Chalumeau's litigation effort was meager.  There is no shortage of examples that substantiate this finding.  It never properly answered Alcatel-Lucent's interrogatories.  It made no effort to prepare its Rule 30(b)(6) witnesses to testify about topics that were undeniably reasonably available to Chalumeau.  It waited until the last week of fact discovery before disclosing a technical expert under the protective order so that expert could review Alcatel-Lucent's confidential production and never disclosed a damages expert.  And, finally Chalumeau walked away from this case on the eve of opening expert

reports, when it would finally have to spend money and effort on the merits of this case.

Chalumeau's last two arguments also fail. First, it argues that a voluntary dismissal should foreclose a fee award. Br. 49-54. Second, it argues that the district court was required to decide the ultimate merits of Chalumeau infringement case prior to awarding fees. Neither of these arguments accurately reflect the law, and they both ignore the Supreme Court's instruction that "there is no precise rule or formula for making these determinations." *Octane,* 134 S.Ct. at 1756.

## ARGUMENT

## I.    STANDARD OF REVIEW

### A.    All Aspects of the District Court's Exceptional Case Finding Are Reviewed for an Abuse of Discretion

Section 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. §285. "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane*, 134 S.Ct. at 1756. Under §285, the party's unreasonable conduct need not be independently sanctionable. *Id.* at 1756-57. Instead, "[d]istrict courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.*

Under §285, the burden of proof is the preponderance of an evidence.

The Court applies "an abuse-of-discretion standard in reviewing all aspects of a district court's §285 determination." *Highmark,* 134 S.Ct. at 1749. "An abuse of discretion may be established by showing that the district court either made a clear error of judgment in weighing relevant factors, or exercised its discretion based on an error of law or on findings which were clearly erroneous." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 772 (Fed. Cir. 1993). Where, as here, the district court "applie[s] the correct legal standard and offered substantial justification for its finding," the court's exercise of discretion must be affirmed. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

### B.    There is Not a Separate Standard of Review for "Claim Construction Frivolousness"

Chalumeau suggests that "claim construction frivolousness" should be reviewed under a different standard of review than the exceptional case standard. Br. 34-35. Relying on this Court's pre-*Octane* decision in *iLOR, LLC v. Google, Inc.,* it argues that an "'exceptional case' finding must be reversed when founded on a mistaken district court belief that a claim construction position was frivolous." Br. 34. Chalumeau misstates the law.

All aspects of a district court's exceptional case determination are to be reviewed for an abuse of discretion, including questions of law such as the reasonableness of a party's claim-construction position. This conclusion is

compelled by the plain holding of *Highmark* and the Supreme Court precedent on which that decision relies.  *Highmark,* 134 S.Ct. at 1748-49 (citing *Pierce v. Underwood,* 487 U.S. 552, 559 (1988); *Cooter*, 496 U.S. at 405).  As those cases show, in contexts like §285, *de novo* review is inappropriate.

In *Pierce*, the Supreme Court held that when a district court takes a backward look at the reasonableness of past legal arguments, even though that may be a "purely legal" question, the court of appeals is limited to reviewing for an abuse of discretion.  487 U.S. at 560.  At issue in *Pierce* was whether the statutory interpretation that the government had advanced in litigation was reasonable ("substantially justified") under the Equal Access to Justice Act.  *Id.* at 555.  The Supreme Court held that reviewing for abuse of discretion, rather than *de novo*, would permit the trial court "needed flexibility" to evaluate the "multifarious" factors that inform the reasonableness of an argument.  *Id.* at 562.  And where "the question [turns] upon not merely what was the law, but what was the evidence regarding the facts," the district court is even more plainly better situated to make the decision, often with the benefit of "insights not conveyed by the record."  *Id.* at 560.

The Court reached the same conclusion in *Cooter*, decided two years later, in a case involving the standard of review under Rule 11.  Again, the Court rejected the appellant's demand for *de novo* review, noting that "deference will

streamline the litigation process by freeing appellate courts from the duty of reweighing evidence and reconsidering facts already weighed and considered by the district court."  496 U.S. at 404.

## II. CHALUMEAU CONCEDED BEFORE THE DISTRICT COURT THAT ALCATEL-LUCENT WAS THE PREVAILING PARTY AND THUS WAIVED ITS RIGHT TO CHALLENGE ALCATEL-LUCENT'S STATUS AS THE PREVAILING PARTY HERE

Chalumeau conceded that Alcatel-Lucent was the prevailing party under §285.  A0025; A2605; Br. 49 n.16.  Nevertheless, in a footnote, Chalumeau argues for the first time that a recent district-court decision holds "that a voluntary dismissal of a patent suit with prejudice, in the absence of a covenant not to sue, does not make the defendant a 'prevailing party' under section 285 and this Court's precedents."  Br. 49 n.16 (citing *Parallel Iron, LLC v. NetApp, Inc.*, 2014 U.S. Dist. LEXIS 127850, at *5-*11 (D. Del. Sept. 12, 2014).  First, Chalumeau did not raise this argument before the district court, though it had the opportunity to submit new authority.  Chalumeau thus has forfeited its right to challenge Alcatel-Lucent's status as a prevailing party on appeal.  *Golden Bridge Tech., Inc. v. Nokia, Inc.,* 527 F.3d 1318, 1322 (Fed. Cir. 2008).

Moreover, even on appeal, Chalumeau only includes this argument in a footnote (Br. 49 n.16), and this Court has held that "[a]rguments raised only in footnotes … are waived."  *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012).

Even if the Court considers Chalumeau's new argument based on *Parallel Iron,* which it should not, Chalumeau's argument fails. This Court has previously recognized that "[t]he dismissal of a claim with prejudice … is a judgment on the merits under the law of the Federal Circuit." *Power Mosfet Techs., L.L.C. v. Siemens AG,* 378 F.3d 1396, 1416 (Fed. Cir. 2004). That is the governing rule here. The district-court decision Chalumeau now cites, *Parallel Iron*, was decided on a unique set of facts that are not present here: the case was dismissed pursuant to a license agreement with a third party that was obtained ***after*** the litigation began and "***without a single substantial court decision that favors that party***.'" 2014 U.S. Dist. LEXIS 127850, at *10 (emphasis added). In this case, Alcatel-Lucent was licensed through its suppliers ***before*** Chalumeau initiated this case. Moreover, in sharp contrast to *Parallel Iron*, the court made several substantial decisions that favored Alcatel-Lucent, including ruling on two motions to dismiss, issuing a claim-construction order, and ruling on various motions to compel.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THIS CASE TO BE EXCEPTIONAL

### A. Chalumeau's Claim-Construction Positions for Key Terms Were Exceptionally Meritless

Chalumeau argues to this Court that the claim-construction positions it advanced "were actually based on the intrinsic record and standard canons of claim construction." Br. 38. But the district court did not agree. In fact, at the hearing

on Alcatel-Lucent's motion for attorneys' fees, Judge Andrews stated that one of Chalumeau's proposed constructions was one of the "wors[t]" constructions he had seen in any of the *forty Markman* hearings he had conducted (A2586-2587; A0028) and ruled elsewhere that another was "really no construction at all." A1939.  Plainly, to Judge Andrews, Chalumeau's case stood out from others with respect to the substantive weakness of its claim-construction positions.

### 1.    Chalumeau's Construction of "Network Hub" Was Effectively No Construction At All, and It Was Contradicted by the Claim Language and the Specification.

Chalumeau's proposed construction of "network hub" was frivolous for two reasons.  First, Chalumeau's construction rewrote the plain, unambiguous language of the claims.  Second, as the district court found in its *Markman* opinion, Chalumeau's proposed construction of "network hub" was really no construction at all.  A1939.

### a.    *Chalumeau rewrote the plain language of the claims.*

Claim 8 of the '885 patent requires "a network hub *coupled to* a plurality of user interface connectors."  A0049(14:39-33).  Without explanation, Chalumeau sought to change that plain language by arguing that the term "network hub" be construed as "a device *having a* plurality of user interface connectors."  A1342-1343 (emphasis added).  This issue was critical to Chalumeau's theory of infringement.  Its preliminary infringement contentions relied on Alcatel-Lucent's

Ethernet switches *having* RJ-45 ports (*i.e.*, user interface connectors).  A2639.  On appeal, Chalumeau concedes that the finding that "user interface connectors" must be "separate" from the network hub presented Chalumeau its "most difficult hurdle."  Br. 59.  Given the admitted importance of this issue to Chalumeau's infringement theory, it was incumbent on Chalumeau to articulate a plausible rational for its proposed claim-construction, which on its face attempts to change the meaning of the claim terms.  It never did, and therefore the district court was well within its discretion to conclude Chalumeau's arguments were exceptionally meritless.

As set forth *supra* at 13-19, Chalumeau's arguments to the district court were (1) misrepresenting that the patent "teaches that a network hub has a plurality of user interface connectors" and (2) relying on obvious typographical errors in the specification.

On appeal, Chalumeau doubles down on its reliance on the typographical errors.  For example, Chalumeau argues to this Court a "hub user interface connector 308" "requires" that the "user interface connector" resides on the "hub."  Br. 9.  Even assuming that Chalumeau is correct (which Alcatel-Lucent disputes) that the patentee intended to disclose a "hub user interface connector" as a separate and distinct type of connector, the claim is directed towards a "user interface connector."  This reference to the patent is to something else, a "hub user interface

35

connector." Moreover, Chalumeau characterization inexcusably ignores the

incontrovertible fact that item 308 is referred to as a "hub user connector" *six* times

in the very same paragraph where this stray reference to a "hub user interface

connector" appears. A0046(8:23-48). The entire paragraph is reproduced below:

> The device presence detector 414 provides a presence request signal on the detection path 406 which is applied to the ***hub user connector 308*** for determining whether an infrared adapter 206 is coupled to the ***hub user connector 308***. If an infrared adapter 206 is not coupled to the ***hub user connector 308***, the device presence detector 414 applies a select signal to the select signal path 416 that selectively couples the ***hub user connector 308*** through the connection path 402 to the pass-through connector 309. This allows communication between a network hub 303 or 304 with a computer 212 coupled to the <u>hub user interface connector 308</u>. In this way, the network hub 302 merely passes data between the network hub 303 or 304 to the computer 212. Such communication is in the protocol of the network hub 303 or 304. On the other hand, if an infrared adapter 206 is coupled to the ***hub user connector 308***, the device presence detector 414 provides a select signal on a select signal path 416 to couple the ***hub user connector 308*** through the connection path 402 to the protocol handler 408. Communication between the network hub 302 and the computer 212 is an infrared protocol. The protocol handler 408 may communicate with another network (not shown) via the up-link connector 310. The protocol handler 408 performs the conversion between the IR protocol and the second protocol, and also performs repeater or switching functions of the IR protocol among user connectors 208 with IR adapters 206.

*Id*. (emphasis added)

Chalumeau also argues that a part of the specification "interchangeably

described item 204 (the purportedly separate-from-the-hub 'user interface

connector') as a 'hub user connectors 204,' and thus on the hub." Br. 22. This is

also not a faithful characterization of the specification. There is *one* instance in the over 100 times that "connectors" are described in the specification where item 204 is referred to as a "hub user connector." A0045(6:35). Item "204" is referred to in the specification approximately 15 times. In every instance, save one, 204 is a "user interface connector." In fact, in the discussion of the same embodiment where the error occurs, the specification explicitly teaches that the three networks hub of Figure 3 "include[] a plurality of hub user connectors," which are assigned numerals 308(6:39), 320(6:41), and 324(6:43). A0045. Those hubs also include "up link connectors" 322(6:41-42), 326(6:43), and 310(6:40), and "pass through connectors" 309(6:39). A0045. Between the hub user connectors, up link connectors, and pass through connectors, every possibly "connector" that is part of the network hub has been assigned. Chalumeau is therefore wrong that item 204 is identified as being "part of the hub."

That Chalumeau would still continue to place so much stock in these apparent typographical errors is telling and demonstrates the frivolousness of its arguments. On this point, this Court's decision in *Raylon* is instructive. *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361 (Fed. Cir. 2012). In that case, the plaintiff relied on a single sentence in the specification to support its broad construction that the term "pivotally mounted" is relative to the user rather than the device's housing. *Id.* at 1368-69. This Court held "[t]his is a clear

instance where no objectively reasonably litigant, relying on the single sentence in the specification to support its position, would believe its claim construction could succeed; therefore, Raylon's claim construction is frivolous and thus sanctionable…." *Id.*

Here, Chalumeau relies not even on a complete sentence, but on isolated and obvious mistakes within the written description. Moreover, its proposed construction that the "network hub" "ha[s] a plurality of user interface connectors" is contrary to the plain language of the claim. Substituting Chalumeau's proposed construction for network hub, claim 8 reads: "a [device having a plurality of user interface connectors…] coupled to a plurality of user interface connectors for…" Thus, Chalumeau's position that the "user interface connector" is part of the "network hub" would result in the network hub being "coupled to" itself, which makes no sense.[6] Chalumeau's position is also contrary to the clear disclosure of

---

[6] Chalumeau takes this argument a step further on appeal. It argues, for the first time, that "nothing precludes such wiring [between the user interface connector and network hub] being infinitesimally short or entirely contained within one equipment housing." Br. 8. This argument is an absurdity; there is no such thing as "infinitesimally short" wiring. Moreover, Chalumeau is wrong. The specification does teach that the wiring is not "infinitesimally short." The wiring that connects the network hub to the user interface connectors is identified as "twisted pair cabling." The specification explains that twisted-pair cables are used for *local-area networks* to connect multiple network devices together—*i.e.*, to connect different devices that are spaced apart from each other. A0046(8:49-55) ("By way of background, local-area network (LAN) applications that include a

(*continued next page*)

the specification that never identifies a "user interface connector" as being part of the network hub.  This is no different than the situation in *Raylon*, where the plaintiff's "claim construction … [was] contrary to all the intrinsic evidence and [did] not conform to the stand canons of claim construction."  *Id.* at 1369.

Chalumeau's remaining arguments all boil down to criticisms that the district court committed the "cardinal sin" of importing a limitation from the specification.  These arguments, however, say nothing about the reasonableness of Chalumeau's constructions and the arguments it made to advance them.  As set forth above, Chalumeau initially misrepresented the teaching of the '885 patent and then relied exclusively on two apparent typos.  At no point did Chalumeau acknowledge, let alone address the fact that the specification defines multiple different "connectors."  Moreover, this Court has repeatedly affirmed claim-constructions that require "separateness" where, as is the case here, the requirement is derived from both the claim language and the written description. *See Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 935 (Fed. Cir. 2013) (affirming that the claim at issue required two discrete disks because, "one does not ordinarily speak of the parts of a unitary structure as being 'affixed' or 'joined' or 'connected' to each other….") (internal citation omitted); *Computer*

---

twisted-pair cable as the media for data transfer typically use a standard RJ45 connector between components of the subsystem.").

*Docketing Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1378 (Fed. Cir. 2008)

(holding that the claims required the claimed keyboard to be separate from the

main housing of the computer because the figures depicted the keyboard to be

"physically separate from the main housing" and "the text [which] confirms that

the keyboard is connected to the housing using connector 24b.").  These cases are

in sharp contrast to *In re Papst Licensing Digital Camera Patent Litig.*, 778 F.3d

1255, 1262-64 (Fed. Cir. 2015), where the claim language at issue was directed

towards an apparatus—an "interface device"—and the Court found nothing in the

specification or claim language itself that required separateness.

### b.    *Chalumeau's construction of network hub was frivolous for the second reason that it was really no construction at all.*

This Court should affirm the district court's finding that Chalumeau's

proposed construction of "network hub" was frivolous for a second, independent

reason.  Putting aside the "having a plurality of user interface connectors" issue

discussed above, the rest of Chalumeau's proposed construction of "network hub"

was "a device … that is capable of (i) identifying the operational protocol of a

coupled device; (ii) communicating data and power to the coupled device when an

adapter is identified as present; and (iii) stopping power when the adapter is no

longer identified present."  A1342-1343.  The subparts of Chalumeau's proposed

construction simply repackage the functional limitations that already appear

elsewhere in the claim; they do nothing to define "network hub," the disputed term within that claim.[7]  In fact, once those functional limitations are removed, Chalumeau's proposed construction of "network hub" boils down to a generic "device."  The '885 patent is clear, however, that not all "devices" are "network hubs."  In fact, the patent distinguishes between many different types of "devices" that appear in local area networks:  "By way of background, local-area network (LAN) applications that include a twisted-pair cable as the media for data transfer typically use a standard RJ-45 connectors between components of the system, such as a network port on PC, workstation, ***hub***, bridge, or routers."  A0046(8:49-53).  Claim 8 does not claim a "PC, "workstation," "bridge," or "router," all of which are "devices," but not all of which are "network hubs."  The district court therefore correctly rejected the rest of Chalumeau's proposed construction as "really no construction at all."  A1939 (emphasis added).

---

[7] *Compare* "that is capable of (i) identifying the operational protocol of a coupled device" *with* "for identifying the operational protocol of a coupled device…"; *compare* "that is capable of … (ii) communicating data and power to the coupled device when an adapter is identified as present" *with* "for communicating data between remote terminals coupled thereto" and "for … continuously providing electrical power to the adapter … in response to the identified presence of said adapter'"; *compare* "that is capable of … (iii) stopping power when the adapter is no longer identified as present" *with* "for … stop providing the electrical power to the adapter in response to no identified presence of the adapter."

In similar circumstances, under the *de novo* standard that applied before *Octane*, this Court affirmed an exceptional case finding in *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306 (Fed. Cir. 2013). In *Taurus IP*, this Court found that Plaintiff's proposed construction of the term "user," "f[e]ll below the threshold required to avoid a finding of objective baselessness" because the plaintiff "proposed that 'user' either not be construed at all, or effectively not construed, as a 'person who uses the claimed computer system.'" *Id.* at 1327. The Court rejected that construction as "unreasonably broad." *Id.* Here, Chalumeau proposed a construction that stripped any meaning from the term "network hub." No reasonable person reading the specification would think that "network hub" was any device on Local Area Network or that it was the same as a PC, workstation, bridge, or router. A0046(8:49-53).

When viewed in the context of the specification and the claim of the '885 patent, it is clear why the court took issue with Chalumeau's proposed claim-construction for "network hub" and determined Chalumeau's positions to be meritless. The court did not abuse its discretion.

### 2. Chalumeau's Construction of "Adapter of a First Type" Was Equally Meritless.

The district court found that Chalumeau's proposed construction of "adapter of a first type" stood out as the "wors[t] construction" it had seen in over 40 *Markman* hearings. A2587-2588. Central to the court's finding was that the

specification defines an "adapter of a first type," an "adapter of a second type," and an "adapter of a third type."  Claim 8, however, only claims an "adapter of a first type."  Chalumeau's construction, "adapter of a particular type," would have stripped any meaning from the claim drafter's inclusion of the phrase "first type." A1941; A0027.

The overwhelming majority of Chalumeau's argument is directed towards its criticism that the district court committed the "cardinal sin" of importing a "wireless" limitation in its construction of "adapter of a first type."  The defense of *Chalumeau's* own proposed construction is relegated to a single paragraph, where Chalumeau notes the two "legitimate arguments in support of its contention that 'first' simply means 'particular' in this context."  Br. 43-44.  Chalumeau's arguments, however, were not legitimate.

First, Chalumeau argues that it had earlier argued that "the term 'first' in this context was a patent-drafting convention that simply sets the modified term apart as distinct from others."  Br. 43.  That Chalumeau would rely on this argument now is puzzling because Chalumeau abandoned the argument before the district court.  Alcatel-Lucent argued in its answering claim-construction brief that the "patent-drafting convention" that Chalumeau relied on was clearly inapplicable to claim 8 of the '885 patent because that claim does not refer to an adapter of any other type, let alone "an adapter of a second type."  A1363-1367.  Chalumeau

43

offered no response in its reply (A1367-1369) and at the claim-construction

hearing, in response to questioning from the Court, Chalumeau admitted that

"adapter of a first type" was not meant to distinguish this term from others in claim

8:

> THE COURT: That can't be right. Are you saying that the inventor just put in the words "of a first type" for no good reason, has no meaning?
>
> MR. JORGENSEN: Well, it could have been a drafting error, your Honor. As we described in our briefing –
>
> THE COURT: Well, I don't recall seeing your briefing it could have been a drafting error. Maybe it was there, but is that what you are saying it is? It's a drafting error?
>
> MR. JORGENSEN: What was argued in the briefing is that typically, that refers to an instance where you have a first type and a second type.
>
> THE COURT: But there is no second type.
>
> MR. JORGENSEN: **_Correct. And that's why I suggest it may be a drafting error, you Honor._**

A2139-2140. In other words, at the claim-construction hearing, Chalumeau took

the position that the inclusion of a "first type" was not a "patent-drafting

convention," but a drafting error—indeed, the very opposite of a patent drafting

convention. Chalumeau's assertion that the district court "overlooked" (Br. 43) its

"patent-drafting convention" argument is therefore not accurate.

Chalumeau's second argument was that the disputed term at issue— "for identifying the presence of an adapter of a first type"—"has nothing to do with the sending of power; it is directly solely to *identifying the presence of an adapter*." A1367-1368.  Chalumeau repeats this argument on appeal by arguing that the specification identifies both wired and wireless adapters, "which is all the ***pinpointed claim language requires*.**"  Br. 43 (emphasis added).  Chalumeau's argument, however, runs contrary to perhaps the most fundamental cannon of claim-construction:  claim terms should not be construed in a vacuum or based only on the "pinpointed claim language" as Chalumeau calls it.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*) ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").

The context of the claim language itself effectively ends the inquiry.  After the adapter of a first type is identified, the network hub "continuously provid[es] electrical power to ***the adapter*** … in response to the identified presence of ***said adapter*.**"  The antecedent basis of "the adapter" and "said adapter" is the "adapter of the first type."  Chalumeau concedes this point now on appeal.  In the paragraph that immediately precedes Chalumeau's argument that the "pinpointed claim language" is not related to the application of power, it argues that "[w]hat mattered

45

was that some devices should be ***detectable*** as properly receiving power, while other devices should be ***detectable*** as properly not receiving power." Br. 43 (emphasis added). Even on appeal, Chalumeau's arguments are internally inconsistent. Either the claim requires the device "should be detectable as properly receiving power" or "[t]he 'identification,' as such, need not be related to the application of power." Br. 43-44. Both arguments cannot be correct.

Ultimately, Chalumeau concedes that the "application of power" is "addressed elsewhere in the claim, [and] this later part of the claim requires it to be of the 'first' particular type before actually applying the power." Br.. 44. Chalumeau's concession on appeal that the adapter must be as a "first" type "before actually applying power" is in stark contrast with its argument at the district court that "claim 8 is not limited to systems that include *only* devices requiring power from the network hub." A1368. This concession, made for the first time on appeal and not in any of its claim-construction briefs or its opposition to Alcatel-Lucent's motion for attorney's fees, cannot save Chalumeau now.

Chalumeau's criticism of the district court's claim-construction of "adapter of a first type" as a "wireless adapter" is misplaced.[8] The essence of Chalumeau's

---

[8] This Court need not (and should not) address whether the district court's construction was correct to resolve this appeal but rather must focus on the merit or the position and/or arguments that Chalumeau advanced before the district court. *Octane*, 134 S.Ct. at 1756 (focusing on "litigating positions").

argument is that because the claim language does not use the word "wireless" the district court must have committed the "cardinal sin" of importing a limitation from the specification.  Not so.  A district court does not improperly read a limitation from the written description into the claims when "the specification … reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess."  *Phillips*, 415 F.3d at 1316.  Nor does a district court improperly read a limitation from the written description into the claims "[w]here the specification makes clear that the invention does not include a particular feature…."  *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340-42 (Fed. Cir. 2001).  As Chalumeau concedes on appeal, "it is true that the specification discloses a 'first type' of adapter that is wireless…."  Br. 43.  In fact, the ***only*** reference to a "first type of adapter" in the specification is an infrared adapter.  Moreover, the specification explicitly and unequivocally teaches that "adapters of other types" (*i.e.*, non-wireless) do not receive power.  *See infra* at 48-50.

Chalumeau argues that "its wirelessness was not the property that mattered to the claim" and the "claim drafter left it as a designer's choice to decide what feature within a particular deployment helped the network equipment detect and distinguish the two."  Br. 43.  Tellingly, Chalumeau cites to nothing in the record to support either of these new arguments.  Indeed, the Court need go no further

47

than the plain language of the claim itself to conclude Chalumeau is wrong. The claim is specific that the "operational protocol" of the detected device is what is used to classify and distinguish the device. For example, claim 8 requires that the network hub "identif[y] the operational protocol of coupled device that indicates the type of device"[9] and "continuously supplying power *according to the type of device*." A0049(14:30-43). The specification then affirmatively teaches supplying power to devices running *wireless* operational protocols, such as infrared and radio frequency, and teaches away from powering adapters of wired protocols such as Ethernet (10Base-T, 100Base T, etc.) and Token Ring:

- "The network 201 provides electrical power to an IR adapter 206 when the IR adapter 206 is coupled to the network hub 202, *but does not provide electrical power for other adapter for other protocols*." A0045(5:56-60) (emphasis added).

- "[T]he network hub 202 (FIG. 2) and the network hub 302 (FIG. 3) of the present invention provide the electrical power to the detected device when the presence of the detected device is confirmed, and *does not provide electrical power* to the connector and the twisted-pair cable when either adapters of another type (such as Ethernet 10Base-T, 100Base-TX 100Base-T4, and Token Ring adapters) are connected or when no adapter is connected." A0044(4:50-58) (emphasis added).

---

[9] The district court construed "operational protocol" as "protocol for communicating data" and "type of device" as "device classified by its operational protocol." A1942-1943.

- "Although the adapter 206 is described herein as operating with infrared, the adapter 206 may provide wireless coupling other than infrared, such as radio frequency."  A0045(5:65-67).

- "Figure 6b is a block diagram illustrating the device presence detector coupled to a remote adapter of a second type in accordance with the present invention. … Because no signal is received, the comparator 624 does not generate a presence signal 638 to indicate that an **infrared adapter 206** is coupled to the device presence [de]tector 414."  A0048(12:9-19).

Finally, Chalumeau also points this Court to "broader statements" in the specification that "suggest" even wired adapters can receive power.  Br. 44 (citing 13:36-51); *id.* at 20.  Specifically, Chalumeau points to a sentence at the end of the specification that states, "[t]he desired device receives the electrical power from the twisted-pair cable without physically attaching to the main body of the system for electrical power supply."  A0049(13:49-51).  As an initial matter, Chalumeau never pointed the district court to those same "broader statements" during the *Markman* proceeding.[10]  Moreover, Chalumeau misunderstands this passage.  Even wireless adapters require at least one wire to connect to the network hub.  A0034 (Fig. 3, showing a solid wire connecting the user interface connector 204 to the infrared adapter 206).  The very same passage makes clear, however, that the

---

[10] For this argument, Chalumeau cites to A1372-1373, which is its opening claim construction position for an entirely different disputed term—"type of device."

"desired device" is for providing "a mobile computing solution for PDA and portable computers." A0049(13:51-53). In other words, the invention is wireless.

### B. The District Court Did Not Abuse Its Discretion in Concluding that Chalumeau Did Not Conduct an Appropriate Pre-suit Investigation

#### 1. Chalumeau's Infringement Contentions Reflected a Frivolous Infringement Theory.

Chalumeau raises a series of new arguments in an attempt to defend the infringement theory reflected in its infringement contentions. Br. 31 (accusing the district court of "misunder[standing] this Power-over-Ethernet case so badly that it ruled that there was 'never any argument' that a powered device's Ethernet connector is 'capable of receiving power.'"); *id.* at 36 (arguing that the district court reasoned incorrectly that infringement could not exist even under Chalumeau's proposed claim-construction for 'adapter of a first type'"). Chalumeau's arguments come too late. They were never raised before the district court in opposition to Alcatel-Lucent's motion, and they should not be considered here. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("If a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument to the trial court. In short, this court does not 'review' that which was not presented to the district court.").

In any event, Chalumeau's new[11] argument that "nothing precluded an 'adapter' from using RJ-45 connectors" is unavailing because it misstates the initial infringement contentions. Br. 39. Chalumeau's infringement contention was not that the "adapters" *use* "RJ-45 connectors." It contended that Alcatel-Lucent infringed the limitation "for identifying the presence of an adapter of a first type" because, according to Chalumeau, Alcatel-Lucent's switches identify the presence of an "RJ-45 adapter." A2642. In other words, Chalumeau's entire case was that "adapter of a first type" *is a* "RJ-45 adapter." Chalumeau's initial infringement contentions contrasted the so-called "RJ-45 adapters" with "RJ-45 ports," which it equated to the claimed "user interface connectors." *Id.* Taken together, the plain implication of these allegations was that Chalumeau's initial infringement theory was that the claim required the network hub to identify the

---

[11] Chalumeau argues that it would have presented this new theory as part of its infringement reports but never got the chance. Br. 36-37 n.11. This statement is further evidence of Chalumeau's "overall litigation misconduct." A0025. At the time of the dismissal, fact discovery had closed and Chalumeau had failed to serve amended infringement contentions. Br. 36-37 n.11. So if this theory existed during the case, it was never disclosed to Alcatel-Lucent. Apparently, Chalumeau's litigation strategy was to spring new theories on Alcatel-Lucent in its expert report. Chalumeau then failed to make this argument in its briefs to the district court, instead arguing that Alcatel-Lucent should have guessed that another theory existed and moved the court to compel supplemental contentions. A2459. Chalumeau's failure to amend its infringement contentions was then raised during the fees hearing and again Chalumeau did not raise with the court that it had a viable infringement theory beyond the one infringement theory presented during the case that an "adapter of a first type" was a RJ-45 plug. A2610-2614.

presence of a commonplace *plug* (*i.e.*, the RJ-45 adapter) at the end of a cable that was "coupled to" the "user interface connector" (*i.e.*, the RJ-45 port).

No reasonable person reading the '885 patent would conclude that the limitation "for identifying the presence of an adapter of a first type" of claim 8 means detecting the presence of a simple plug at the end an Ethernet cable.  The term "adapter" describes components in the network, and the specification referred to "detected network adapters" (4:37) or "infrared (IR) adapters" (4:40) or "Ethernet adapters" (4:43) or "Token Ring adapters" (4:47) or "remote adapters" (12:10).  A0044; A0048.  Indeed, both parties agreed at claim-construction that an "adapter" was among other things a "device" (Alcatel-Lucent) or a "network interface device" (Chalumeau).  A1391.  In sharp contrast, when the patentee wanted to refer to the *ports* on a piece of equipment or *plugs* on a cable, it used the term "connector."  For example, the patent explains that "[i]n one embodiment of the present invention, the user interface connectors 204 are conventional RJ45 connectors."  A0045(5:26-28).  Similarly, it describes that "[a]standard RJ45 connector is used with twisted-pair cable in Ethernet … and Token Ring systems."  A0046(8:53-55).  In addition, Claim 8 itself refers to both "user interface connectors and an "adapter of a first type."  The two are not reasonably read to be interchangeable.

### 2.    Chalumeau Misrepresented the Thoroughness of its Pre-suit Investigation to the Court.

Chalumeau argues that the pre-suit investigation is "legally irrelevant" to the exceptional case determination is completely without merit.  Br. 48.  That was not the law under *Brooks Furniture*.  *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1311 (Fed. Cir. 2013) ("Factors such as the failure to conduct an adequate pre-suit investigation … are factors which can be indicative of bad faith" under *Brooks Furniture*).  Nor can it be the law under the relaxed "totality of circumstances" test set forth in *Octane*.  The Supreme Court was clear in *Octane* that there is "no precise rule or formula for making these determinations."  *Octane*, 134 S.Ct. at 1756.  Plainly, an inadequate pre-suit investigation is a relevant factor in the §285 inquiry.  The issue is not whether Chalumeau's conduct was actually a Rule 11 violation, but rather, the effort that Chalumeau put forth in its pre-suit investigation as further evidence of its overall effort and motivation.

As noted above, Chalumeau did not address Alcatel-Lucent's argument that it was frivolous for it to equate an "RJ-45 adapter" with the claimed "adapter of a first type."  Instead, Chalumeau first argued that "[Alcatel-Lucent] never moved to strike Chalumeau's infringement contentions during the course of litigation and never moved to compel Chalumeau to provide more detailed infringement contentions."  A2459.  That argument was inappropriate for a variety of reasons, and has not been pursued by Chalumeau on appeal.  Chalumeau's only other

"argument" appeared in a footnote where it attested to the soundness and thoroughness of its pre-suit investigation by asserting "*[e]ach family* of the accused power-over-Ethernet products was individually vetted and analyzed" and "[a] thorough pre-filing investigation *for each of the accused products* occurred and *each family of product* was *separately charted* with relevant supporting technical documentation." A2459 (emphasis added). As set forth *supra* at §III.D, those representations turned out to be untrue.

Based on its *in camera* review of Chalumeau's pre-suit investigation, the district court also found that Chalumeau's pre-suit investigation was "consistent with the meager effort Chalumeau put forth in the rest of the suit" and that it improperly "lump[ed]" multiple limitations together. A0027. There is no basis for this Court to disturb that finding.

Chalumeau contends that it was "unfair" for the district court to criticize Chalumeau for lumping so many terms together because it could not possibly know what claim terms Alcatel-Lucent would proffer for claim-construction. Yet, based on the court's and Chalumeau's description of the pre-suit document, it appears that Chalumeau treated the heart of the claim as one issue A0049(14:30-43). Considering the only other limitations in claim 8 where the preamble, which recited "a network system" and the "plurality of user interface connectors," which the specification acknowledges were well-known in the prior

art (A0045(5:27-28)), it cannot be said that the district court abused its discretion by concluding that language should have been broken up at least somewhat for Chalumeau to meet its pre-filing investigation obligation.

## IV. CHALUMEAU SHOULD NOT BE "PRAISED" FOR DISMISSING ITS CASE AFTER TWO YEARS WHEN IT HAD NO OTHER CHOICE AND THE DISMISSAL HAD AN UNREASONABLE PRECONDITION

### A. A Voluntary Dismissal Does Not Foreclose an Award of Attorneys' Fees Under 35 U.S.C. §285

Chalumeau argues that no court should sanction a plaintiff who voluntarily dismisses its case. Such a rule would run afoul of the Supreme Court's instruction that "there is no precise rule or formula" for making exceptional case determinations. *Octane*, 134 S.Ct. at 1756. The district court correctly found that the totality of the circumstances warranted determining this case to be exceptional, notwithstanding Chalumeau's dismissal after two years of litigation.

### B. The District Court Did Not Abuse Its Discretion in Finding that Chalumeau's Entire Litigation Strategy Was Devoted to Stringing Out the Case in the Hopes that Alcatel-Lucent Would Incur Fees While Chalumeau Would Not

The timing of and circumstances surrounding Chalumeau's dismissal, which came one month before expert reports were due, are relevant here. Chalumeau did as little as possibly in fact discovery and claim-construction. It made no effort to properly prepare its Rule 30(b)(6) witnesses. It failed to comply with court orders to supplement interrogatory responses. When these failures were raised in Alcatel-

Lucent's fees motion, Chalumeau again misrepresented the record. It argued, for example, Alcatel-Lucent "never asked Chalumeau to supplement its discovery responses or moved the Court to compel Chalumeau to take such action." A2464. This was yet another untruth. Indeed, at the hearing on Alcatel-Lucent's fees motion, Chalumeau's counsel was unaware that Alcatel-Lucent had even moved to compel more complete responses. A2609. In fact, the district court had to hand Chalumeau the order. A2609. The court then remarked:

> THE COURT: I think the point is, your brief made it sound as though they didn't try to follow-up on what they regarded as your deficiency That doesn't actually seem to be the case.

A2610.

Other examples of Chalumeau's "meager" (A0027) effort in this case abound. No expert was reviewing Alcatel-Lucent's technical document production in anticipation of opening expert reports. A2109. In fact, Chalumeau did not disclose a technical expert under the protective order until November 8, 2013, one week before the close of fact discovery. A2402; A1029. Even more telling is that Chalumeau never disclosed a damages expert. A2626-2627. In sum, from the beginning, Chalumeau had no intention of allowing this case to reach a decision on the merits.

### C.    Alcatel-Lucent's License Defense Was Not the Driving Force Behind Chalumeau's Decision to Drop the Case

In the district court, Chalumeau's primary argument was that the "economics" of this case changed when the Court granted Alcatel-Lucent's motion to amend its answer to assert a defense of license based on the RPX license agreement.  A0029.  In fact, Chalumeau argued that its late dismissal was *Alcatel-Lucent's* fault because Alcatel-Lucent delayed in asserting the license defense.  It argued that Alcatel-Lucent had recently produced documents that show that RPX members provided licensed components to Alcatel-Lucent's accused Ethernet switches.  The district court correctly saw through and rejected Chalumeau's proffered justification.

Two months before Chalumeau sued Alcatel-Lucent, it granted a sweeping license to RPX and all of its members.  By *October 2012*, Alcatel-Lucent had produced documents identifying that ███████████████████, all RPX members, had supplied Ethernet switching and PoE components.  A1953-1954 (citing documents).  Chalumeau, despite knowing about the RPX license, nevertheless pressed on with its infringement case.  It did not produce the RPX License Agreement until March 2013—three months after Alcatel-Lucent produced its documents.  A2454.  More importantly, despite knowing about the RPX license and having access to Alcatel-Lucent's supplier, it appears that Chalumeau did not make any effort to determine whether RPX granted a

sublicense to the Alcatel-Lucent suppliers as it had every right to do under the

RPX License.  A1776-1778.  Instead of conducting its own investigation,

Chalumeau instead continued to assert its infringement case as Alcatel-Lucent

pursued third party discovery from RPX to obtain the proofs necessary to establish

its defense.  A1779-1780.  When Alcatel-Lucent finally received confirmation

from RPX that its suppliers had received licenses to the '885 patent, it provided the

information to Chalumeau within two days and timely moved to add the license

defense.  A1776.

At no time during that process did Chalumeau contend that the license

defense was a game-changer.  Instead, Chalumeau opposed Alcatel-Lucent's

motion, arguing the license defense was futile.  In other words, Chalumeau argued

that "as a matter of law, no license was, or has been, granted by RPX to Alcatel."

A1915.

On appeal, Chalumeau suggests (although largely in the factual background

and not in any argument) that Alcatel-Lucent's interpretation of the agreement was

wrong.  In doing so, it makes the agreement much more complicated than it really

is.  It argues that "RPX members would only have need or desire for license rights

that extinguish direct infringement liability" and that "[t]he RPX agreement does

not give rights to RPX membership for such piecemeal solutions."  Br. 16-17.  Not

only were these arguments not raised in any of the briefing below, but they are

contradicted by the express, unambiguous terms of the RPX Agreement itself.  By its express, unambiguous terms, RPX received a license to the '885 patent for all ██████████████ A1842-1844.  The express definition of ██████████ ██████████ (1) *included* ████████████ and (ii) ████████ ██████████████ A1840.  A ████████████ ████████ is any ████████████ of a Licensed Product with any other third party product, provided that an RPX Licensee's product ████████████ ██████████████████████ A1840.  For a larger product to be licensed, all Alcatel-Lucent needed to do was show that an RPX Licensee supplied a component that ██████████████████████ ████████ Chalumeau's argument that "it would not be enough for Alcatel to show that ████████████████████████ ████████ is therefore wrong.  The district court was well within its discretion for finding Chalumeau's attempt to shift the blame to Alcatel-Lucent for needing discovery to uncover the license defense when the supplier information and access to RPX was within Chalumeau's control for many months.

### D.   Chalumeau's Last-Minute Settlement Demand and Unreasonable Precondition Are Further Evidence of Its Bad Faith

Even when Chalumeau did not intend to pursue its case on the merits, it did not simply capitulate.  Chalumeau first tried to extract a settlement from Alcatel-Lucent, culminating in a *$100,000* settlement demand on the day it offered to

dismiss.  A2540.  A plaintiff's demand of a six-figure settlement when it was apparently prepared to dismiss the case with prejudice for nothing reeks of bad faith.  Even then Chalumeau conditioned its dismissal with the demand that Alcatel-Lucent agree to waive its right to attorneys' fees.  A2021.  When Alcatel-Lucent objected to Chalumeau's unreasonable condition, the Court agreed with Alcatel-Lucent.  A2020; A2027.

## V.   CHALUMEAU IS INCORRECT THAT THE DISTRICT COURT NEEDED TO REACH THE MERITS OF ITS INFRINGEMENT THEORY AS A PREREQUISITE TO DETERMINING THAT THIS CASE WAS EXCEPTIONAL

Chalumeau's last argument is that the district court failed to address the "critical task" under *Octane—the* "substantive strength of [Chalumeau's] litigating position" under the district court's claim-construction.  Br. 57.  In other words, Chalumeau argues that the district court was required to conduct a full infringement analysis to determine whether Chalumeau would ultimately prevail, on at least some, portion of its claim before it could declare a case to be exceptional.[12]  Chalumeau misreads *Octane*.

Under *Octane*, there is no rule (nor should there be) that a court needs to reach the ultimate merits of the parties' case before awarding fees.  *Pierce*, 487

---

[12] Notably, the court did address the only infringement theory Chalumeau actually presented to the district court but the Court recognized that the RJ-45 plug could not be the claimed adapter.  A0025-0026; *supra* at §I.

U.S. at 569; *Cooter*, 496 U.S. at 395-96. *Octane* speaks only of the "litigating position." Here, Chalumeau's "litigating positions" were the claim-construction positions it advanced to the district court and its infringement theory. Moreover, a rule that a district court must reach the ultimate issue before finding a case to be exceptional would run afoul of the Court's instruction that "[t]here is no precise rule or formula for making these determinations." *Octane*, 134 S.Ct. at 1756. Chalumeau's argument also ignores that *Octane* endorsed "objective unreasonableness (both in the factual and legal ***components*** of the case)" as one of the non-exclusive list of factors that courts can consider. *Id.* at 1756 n.6 (emphasis added).

Chalumeau's argument also fails because it relies exclusively on arguments that were never raised before the district court. Before the district court, Chalumeau offered a one-sentence "opinion" from its expert[13] that "... Plaintiff had a reasonable, good faith infringement read on all the accused products." A2485. That is the only sentence Chalumeau submitted to the district court defending its infringement case. Its appeal brief, on the other hand, contains three pages of new infringement theories. Br. 58-60. At one point, Chalumeau goes so far down the rabbit hole that it ask this Court to speculate that "literal infringement ***might*** still

---

[13] The only time that Chalumeau submitted an expert declaration was in an attempt to avoid a fee award. A2454.

exist *if* one considers the electronic boards within the overall housing to be the actual 'hub,' which are thus 'separate' from the connected RJ-45 ports." Br. 59 (emphasis added). This argument only makes Alcatel-Lucent's point that Chalumeau's positions have been forced and untenable. There is not a shred of support in the specification that would permit "one" to "consider[] the electronic boards within the overall housing to be an actual 'hub.'" This Court need look no further than Figure 2, which explicitly and unequivocally labels the entire device, *i.e.*, the housing, as the "network hub," to reject Chalumeau's new theory as frivolous.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's (1) judgment that this case is exceptional and (2) award of attorneys' fees.

Respectfully submitted,

Dated: April 10, 2015

/s/  Lana S. Shiferman

J. Anthony Downs
Lana S. Shiferman
Robert Frederickson III
GOODWIN PROCTER LLP
Exchange Place, 53 State Street
Boston, MA  02109
Tel:  (617) 571-1000

***Counsel for Defendant-Appellee
Alcatel-Lucent Enterprise USA***

# CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2015, I caused the foregoing document to be electronically filed with the Clerk of Court using CM/ECF, which will send notification of such filing to counsel of record, and caused to be served true and correct copies on the following counsel in the manner indicated:

VIA MAIL

Robert P. Greenspoon
FLACHSBART & GREENSPOON, LLC
333 North Michigan Avenue
Chicago, IL 60601
(312) 551-9500
Email: rpg@fg-law.com

Brian E. Farnan
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
Email: bfarnan@farnanlaw.com

*Attorneys for Plaintiff-Appellant Chalumeau Power Systems, LLC*

Dated: April 10, 2015          /s/ Lana S. Shiferman
                                     Lana S. Shiferman
                                     Lshiferman@goodwinprocter.com

# CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief for Defendant-Appellee Alcatel-Lucent Enterprise USA complies with Fed. R. App. P. 28.1(e). The brief contains 13970 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b). This brief complies with the typeface requirements of Fed. R. App. P. 28.1(e) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point, Times New Roman font.

Dated: April 10, 2015                        /s/  Lana S. Shiferman
                                             Lana S. Shiferman
                                             ***Counsel for Defendant-Appellee***
                                             ***Alcatel-Lucent Enterprise USA***